All right, our next case is 23-3232, Koel v. Citizens Medical Center. Mr. Sternberg. Thank you, Your Honor. Thank you, Your Honors. May it please the Court, I'm Jonathan Sternberg and I represent the appellant Ricky Koel, and I'd like to reserve three minutes for rebuttal, if at all possible. After ascertaining that Mr. Koel had an emergency medical condition that emergency room staff suspected, and that ultimately turned out to be a ruptured eye globe, which means an actual rupture in the eyeball itself, the Appley Hospital in this case violated its own procedures in failing to forward Mr. Koel's results and records to a qualified specialist physician for diagnosis, failing to transfer him to a facility capable of diagnosing and treating that injury, and failing to stabilize him before releasing him, reasoning in testimony that's in the record that because he couldn't pay, it could, quote, waste a surgical team and possibly incur a, quote, five-figure medical bill. Counsel, Judge Teter said that the failure to forward the CT scan results was a de minimis violation. Why is that wrong? So in the hospital in this case, and I'll get, this is the preface for answering that, Your Honor. The hospital in this case minimizes almost to nonexistence the failure to stabilize issue. It's not de minimis here because the, so Judge Teter said, and the hospital argues, that because they didn't know that this was a ruptured eyeball, they weren't positive of that, there wasn't an emergency medical condition. They, in fact, Judge Teter, even on page 20 of her summary judgment order, says the hospital did not determine the plaintiff had an emergency medical condition. The problem is diagnosing the actual ruptured globe wasn't the emergency medical condition. They had ascertained, and in fact, their corporate representative, Ms. Niblock, it's on page 109 of volume 9 of the transcript, of the record, that's one of those quad pages, it's subpage 5, testified specifically that they did ascertain he had an emergency medical condition. Having ascertained that, the question of whether they could release him in stabilized condition went to, what was this condition? And once they had received, so initially they suspect that it's a ruptured eye globe. They sent him out for a CT scan. In the middle, this unqualified non-physician optometrist says, oh, I think it's a scratched cornea. But then at 5.26 p.m., which is before he was released, a couple of hours before he was released, the results of the CT scan come back. They're forwarded to a Dr. Kirkpatrick, who is a consulting physician up in Nebraska. And Dr. Kirkpatrick says, looks to me like there's a possibility of a ruptured eye globe here. Dr. Kuhlman, who is the OR physician, or the ER physician, who was on call that day, was a family medicine specialist, testified himself in his own deposition that he couldn't tell at the time that Mr. Cole was released that Mr. Cole actually was stable, because he wasn't capable of ascertaining that. Is there a requirement to stabilize if you have not determined that there was a problem? I mean, when you only thought there was a possibility of a problem. Sure. That's a great question, Your Honor. Does that trigger the obligation or not? It does, and I'll explain why. And any possibility or probability, how would you articulate when that is triggered? Sure. So it's triggered when the results show that there is a possibility that there is this debilitating problem. Possibility. One percent, you're using the word possibility, meaning it's not impossible? No. I would go off what the actual medical record here said. So here, the report from the radiologist says, margins of right globe are somewhat irregular, some degree of right globe rupture possible. And he, of course, then suggests that there should be something further. But he doesn't define what he means by the word possible, either.  But so here. I just, I have difficulty believing that it could be an obligation to stabilize every non-impossible condition that might be encountered by all these rural hospitals with such limited facilities. Sure. So here, Your Honor, remember, of course, we're in summary judgment. And the issue is viewing the evidence favorably to Mr. Cole and drawing inferences in his favor. Here, from Dr. Kuhlman's testimony, that because he didn't, he wasn't capable of ascertaining this, he didn't know whether Mr. Cole was stable when he was released. That alone is an EMTALA violation. In our briefs, we cite, and it's a pity there are no Tenth Circuit cases directly about this issue. I certainly did look for them before this. There's only 21 Tenth Circuit cases ever even citing EMTALA. We cited a couple of cases, two from the District of Kansas. One's Palmer from 2017, one is Scott from 1997. So in Scott, which I think answers this question, they were aware that the patient had a cardiac issue when he came into the emergency room. They hadn't yet determined whether it was internal bleeding or something like that. It ultimately wound up being a bleed. But they released the patient without ensuring that that original condition, what he came in with, was stable. Here, based on the information available to the emergency room doctors, emergency room doctors, singular was Dr. Kuhlman, even he wasn't sure that Mr. Cole was stable when he was released. And that is the bottom line EMTALA requirement. The hospital has to determine whether an emergency and emergency medical condition exists. I think it's undisputed here, despite what Judge Teeter said at the end of her judgment, that they determined an emergency medical condition exists. Did you argue in the district court that the possibility of a ruptured globe is an emergency medical condition? No. We argued that — I'm not even arguing that here, Your Honor. The emergency medical condition is Mr. Cole presents to this rural emergency room with a lacerated eye, with possible bleeding inside the eye that they were able to see immediately, with a hematoma is the term that's used, and in severe pain and he's vomiting. That's the emergency medical condition. And they had to ensure that he was stable from that emergency medical condition before discharging him. From that possible medical condition? No, the emergency medical condition is him — clearly it's not possible. I mean, even the corporate representative said he had one. The emergency medical condition is presenting with this hematoma in the eye, having been whipped by a piece of wire, vomiting from pain, and the sight going away. That's the emergency medical condition. And they didn't stabilize him. Even Dr. Kuhlman admits they never actually stabilized the condition he came in with, partly because they didn't know what it was. And the hospital stated — And you said they didn't have the capability of stabilization. Sure. Because he needed a specialist. That's exactly right. So the hospital's own practices, and this is, frankly, it's undisputed as well, that their standard practice for an eye emergency is to forward the information and CT results to a medical physician qualified to interpret these results. Here, it was Dr. Clifford. And Mr. Funk, who's — or Dr. Funk, who is the optometrist who did see Mr. Kuhl, testified in his deposition that whenever I called Dr. Clifford about one of these eye emergencies, he would always respond to me within 15 minutes. And they easily, certainly could have done that. And under EMTALA, when you have a — I appreciate you're going to have rural, small hospitals like this in western Kansas that aren't, you know, equipped like a hospital here in Denver might be, but they still — that's why they have this ability to refer the results, et cetera, to a qualified specialist. And they testified that they routinely did that. That was their practice. Here, the hospital didn't, however, and what Dr. Funk testified was the reason for that was they wanted — they worried it would, quote, waste a surgical team. The other thing that they testified they could do is — Waste whose surgical team? Excuse me? Oh. It would be the transfer hospital, right? Well, that's the secondary possibility. So there are two things — Because it's, you know, just — it seems to me the problem here is the failure to transfer. That is one of them. Yes. You know, I understand your argument on stabilization and maybe there was a misdiagnosis there or not. Yes. But I think if they — if I understand your argument, if there was a possibility of a serious medical condition, the obligation was to transfer it to a hospital that had the capability of treating that condition. Sure, Your Honor. And just — I mean, EMTALA exists to prevent hospitals from dumping patients to other hospitals to avoid financial risk. And I asked a couple of questions there, but is there really any incentive for citizens not to have transferred him to Garden City or Wichita or — None at all, Your Honor. No, that's true. They said they could have transferred him. I think testimony was — Would they have been exposed to any financial obligation for that transfer? Well, I think the issue is Mr. Cole couldn't pay. I mean, I don't think that's undisputed in the record either. And — Would citizens have to pay? Would they — well, so, Your Honor, if Mr. Cole owed a five-figure medical bill to citizens that he couldn't pay, he might go bankrupt. That happens, unfortunately, all the time, at which point, having had — having been a creditor in bankruptcies before, you might not get paid. So — I know, but the transfer financial risk would be on the ambulance company or the receiving hospital? I don't think that's in the record one way or another. I know that the doctor was concerned that they would incur an unpaid medical bill. And to go into your question a little further, Your Honor, it's both. It's both the failure to refer these results to a physician — because the next morning when my client went and saw Dr. Fry, who was an ophthalmologist, Fry immediately, without seeing any other results, said, oh, my God, you have to go to a specialist hospital, and sent him to one. Unfortunately, by that point, it was too late, and as a result, my client is blind in his right eye. But they certainly could have transferred him. In fact, I think the testimony was the transfer would have been to Wichita or here to Denver, because Denver's about three and a half hours from Colby, Kansas. If this isn't an EMTALA violation — so, if you look at Judge Teeter's order, she effectively requires an outright refusal to treat a known medical condition that would have been properly diagnosed in order to ever have an EMTALA violation. That is not how EMTALA works. And here, really, it's the failure to ensure he was stable before either — but before releasing him. And under EMTALA, the transfer can be a requirement under its Section C, which says it has to be an appropriate transfer. And if the rural hospital can't treat him, they have to transfer him somewhere. And here, I think it's undisputed, because they really don't mention it. I do want to mention one thing. In their brief, the appellees, on page 35, ask this rhetorical question. What additional screening could have been done but was not done because of concerns he wouldn't pay CMC for the screening? I think, clearly, the record answers that for itself. It's — they could have easily, just as they do in most cases, sent the results to a physician who, like Dr. Fry, immediately would have seen what this was.  Well, but was it Dr. Fry? One of the physicians said that it wouldn't have made any difference. TALA. So, Dr. Fry said that wouldn't make any difference. We had an expert who said different. We had, actually, two experts. There was a Dr. Lundgen, and then there was one that Judge Teeter does not mention. And I'll mention this real briefly. It was — we had an expert who said that. I know that. In any case, so you're saying summary judgment could not be predicated on the fact it wouldn't make a difference because there was a genuine dispute of fact about that. That's your point. There is a genuine dispute. That's all you need to do to defeat summary judgment.   Counsel, could you speak to our decision in Phillips v. Hillcrest and why that wouldn't, as a matter of law, be dispositive on your claim that MTALA supports actions based solely on evidence of bias against non-insured patients? Oh, I don't know that it's solely — and I apologize if that came through in the argument here. I do not agree that solely on evidence of bias it's enough. In fact, you have to show an underlying MTALA violation. In fact, I think in our brief we argue — So you say that Phillips doesn't dispose of that claim for you? No. I don't think it does. And can you say more about why that's so? So as I recall, the point in Phillips is that bias itself is not enough. And I agree with that. It's a factor that the court or a jury can certainly take into account in determining whether there has been an MTALA violation. But we still have to show the underlying violation. I think here the bias only adds to it. I'd like to reserve the rest of my time for rebuttal. You may. Thank you. Thank you, Your Honor. May it please the Court, I'm Brian Wright on behalf of CMCI, Citizens Medical Center Incorporated, or CMC. The MTALA statute was enacted in order to provide a very simple thing. And that is a screening to a patient who arrives at an emergency department of a hospital who receives Medicare or Medicaid money in the United States to prevent that hospital from sending that patient immediately and automatically without finding out what might be wrong to another hospital in order to avoid the financial responsibility of dealing with an uninsured patient. Is MTALA limited just to decisions at the emergency room intake, or is it broader than that? It's broader. The Urban case was one. The way you just described it, it was focused just on the emergency room initial intake. Exactly. That was what Congress intended. It was a little bit broader in the language that was enacted. But the congressional record that we cited in the brief talks about the fact that, and the Baber case talks about that Congress wanted to have an adequate first response to a patient who walks through the doors of the emergency department. But you agree that this statute is broader than that? It's not limited just to first decisions in an emergency intake? Not first decisions. No. No. What it does is it says if the patient dumping problem came about with ambulances who would actually call to an emergency room and say, we're bringing such and so patient, they would be asked the question, does that patient have insurance? And they would be then directed to the next hospital down the road. So it is about just that first thing. That's what it was intended to do. But yes, it is broader. It does go to the question of what do we do once that patient is in the hospital? And that's where the litigation developed in the late 80s, early 1990s with all the cases that we've cited, that said, including this court, very clearly, that this does not establish a malpractice cause of action. It establishes a cause of action that says, is there an emergency medical condition? If it is found to be a medical, an emergency medical condition, then that condition needs to be stabilized, or if it can't be stabilized at the hospital where the patient has presented, then it needs to be transferred to another hospital where that can be done. Why isn't the differential diagnosis here sufficient to show knowledge under B-1? Because a differential diagnosis is not a diagnosis, and because this court's own decision in the Urban case says that actual knowledge of the condition is required in order to trigger any stabilization requirement or any appropriate transfer requirement. And the questions that I heard in the first part of the argument here, in essence, address that very point, which is, if we have ten different possibilities for what might be causing a problem, then that interpretation of Intala would say every single one of those has to be thoroughly investigated, and that is not what the statute was. But there was actual knowledge of a possible rupture globe. That's known when a patient comes in with blood all over his eye and obvious trauma to the eye. That's known to everybody involved. That's not an issue. What's at issue in this case is that the plaintiff, we've had a pretrial conference, we have a pretrial conference order. This is on summary judgment motion after all of discovery is completed, and the plaintiff has chosen the claim. This statement, this idea that there was a possibility that needs to be addressed is not in the pretrial conference order. We've cited the pretrial conference order, which says the patient arrived with a ruptured globe. That is the condition that needs to be stabilized. That is the condition that can only be stabilized, in fact, can only be diagnosed with surgery. So it's too glib to say it in a case about eyesight, but hindsight is 20-20. And this patient's injury was not known at Colby, at Citizens Medical Center, was not known at Garden City the next day by Dr. Frey, was not known by the next physician that examined the patient in Wichita, but was known by the surgeon who then went in and opened up the eye and found the rupture of the globe. So that's when this condition was discovered. It's the only way it could have been discovered. So to go back and say, you knew that that condition existed, well, of course we knew it was a possibility. But what we evaluated within that hospital was an appropriate screening that was within the capabilities of that hospital, including those things that are routinely available in ancillary services at that hospital. That's what CMCI did in this case. The statute is intended to provide an adequate first response to a medical crisis. The statute in Baber was noted to say to all Americans, you should know that a hospital will provide what services it can when that patient is in physical distress. The services that were provided here were every single one of the services that can be provided within the capability of this hospital. The patient came into the emergency medical, into the emergency room, was evaluated by a physician assistant, then by a physician, then by an optometrist, then with specialized equipment, then a CAT scan, and that's all that they can do. Now, that's the end of the screening process at this hospital. You know, it seems, I mean, you can think of a fact pattern where there would be 12 possibilities from something benign to something serious. And, you know, here it's like, I guess my take on the record is there was one relatively benign explanation, which the hospital accepted, and there was a devastating possibility, you know, with eyesight at risk. Sure, and there were many others. It's not, I mean, they aren't really something that is necessary to discuss here. For our purposes, I don't think, but there's plenty of other parts of the eye that can be injured. The globe in the place that it was ruptured in this case was particularly difficult to find. That's why I said it wasn't discovered until surgery. Well, I know. It was a bad case, but the hospital sent him home, basically, with painkillers. And, you know, like I was exploring with counsel, it seems that, you know, this is a case where the condition was serious, the emergency was serious enough where there should have been a strong recommendation of a transfer. That's, and I'm going to emphasize the word should in your statement, because that's exactly what malpractice is for. And there are pendent state claims that were part of this lawsuit, and they're still there. They are still there to be litigated. And so the question of what should have been done is the malpractice question. The question of what was actually known and what was actually done by the hospital is really pretty straightforward. The Urban case, for example, you had a baby who was in the process of suffering severe, irreversible, lifelong brain damage in the Urban versus King case that was decided in this court in 1994. There was a nonreactive stress test that was done. The nurse calls a doctor and says, what should I do? The doctor says, you should send the patient home. The next day, then, the baby was born with severe brain damage, and this court held. That hospital did not have actual knowledge of the condition that ultimately caused the injury, and because of that lack of knowledge, the stabilization and transfer requirements were not triggered. And that case has not been negatively viewed by anybody at any court since 1994. We gave the example of the Cleland case in the Sixth Circuit in 1990, where a patient, a teenager, died of a condition of the intestine where the intestine had folded in on itself, and that could have been discovered, but it was not discovered. The patient was sent home and died. They thought that the patient had the stomach flu. The case of Baber was a case where a patient had a subdural hematoma that ultimately killed her, and she was evaluated in many different ways, but none of which were designed to get to that point. They thought that she had psychiatric problems, that sort of thing, completely undiagnosed. Again, same holding. The holding is that if you don't know what the condition is, you can't be required to make the transfer or to stabilize that condition. Now, I want to address the point that the appellant made in regard to Ms. Niblock's testimony, the corporate representative from the hospital. She testified, she was asked the question whether or not the patient presented in an emergency medical condition. Well, yes, he did, was her answer. That was her answer that bound the corporation defendant, and then there were questions asked about what is done in general eye emergencies, not situations where there's a specific problem that has to be operated on in order to solve the problem, and the ultimate answer that she gave was, I do not believe that Dr. Kuhlman or Dr. Funk felt like he had an open globe. So it was not an admission that the patient had an open globe. And I go back to that fact that the pretrial conference order specifies that the claim that the plaintiff made, the remedy, the way that they chose to approach this case is to say he had a ruptured globe that was undiagnosed. So would you, this is obviously a hypothetical, but if that was not what the pretrial order, final pretrial order specified, and really the focus that the appellant made was on the possibility of a ruptured globe as the emergent medical condition, would that be different? Well, I thought that through quite a bit. I don't think it makes a difference because it's not what's claimed, but I do think that it could potentially make a difference, but in the end it isn't going to make a difference because there's no evidence in this record that says what we do with potential or possible ruptured globes. I agree with that as a general principle. I think Judge Timkovich and you would engage in that, that it could be a range of possibilities and certainly differential diagnosis per se can't constitute actual knowledge. But here there's one obvious thing that it could have been, and my question is, is it your recommendation to us that we not engage with the possibility of a ruptured globe because the final pretrial order didn't account for that? Absolutely, absolutely. You can only deal with what claims are being made in the case. You can't address ones that aren't made. So the possibility of a condition in this circumstance does not require stabilization, does not require appropriate transfer. Now, I do want to address lastly the question of the CT scan results. Remember, this patient came in with blood coming off the eye, vomiting from the pain. It was obvious that he had an emergency condition that needed to be addressed in that emergency room, and the standard procedure of doing a CT scan was done. That information was provided to Dr. Kuhlman. Now, Dr. Kuhlman, the emergency physician, says, I already knew that it was a possibility that he had this condition. I don't need to forward that to Dr. Frye, who we've already talked to and who already believes it's a possibility and who already has said, send this patient to my office to be evaluated first thing in the morning. It doesn't add anything. That's my decision. Now, the hospital obviously is not the entity making that decision. Its doctor is acting on its behalf. So can Dr. Kuhlman's personal practice, is that not enough to establish a hospital policy? Absolutely not. That's exactly the next thing I was going to say. It does not. There are multiple physicians on staff there. They may choose to do it differently. The plaintiff never proved in this case, never established, never went and got evidence that says the hospital generally does it this way. That is simply not there. The policies that are in the record talk about the obligations under EMTALA to find out within the capabilities of the hospital what the problem is and then to attempt to stabilize it or transfer it. And that is all that those policies say. So one physician's way of doing it does not set policy because the other physician the next day may do it a different way. What if he's the physician? It's a small rural hospital. Could it ever be the physician? That would be a different story. Yeah, that could be a different story. You could have the sort of informality in that situation where the policy is indeed what he usually does. But that is not what the record says here. We would ask you to affirm. Thank you. Thank you, Counselor. Mr. Sternberg, you had some rebuttal? A very short time I have. I want to address a couple of things. Counsel cited a bunch of case law that he said is analogous. It is not. The Urban case, for example, was where a woman presented just for an ordinary stress test at a maternity ward and the stress test came out negative. There was nothing wrong. Nothing was suspected to be wrong. The next day she complained of pain and was then admitted to an emergency room in, of condition that resulted in a stillborn baby was found. There was no knowledge of any emergency medical condition of any kind in that case. Second, I want to go to the pretrial order. This is on page 72 of volume 1 of the appendix. I think Counsel is minimizing what we actually argued there. So we talk about what a rupture in the eyeball is. It's an emergency medical condition under the meaning of EMTALA and per the standard of ophthalmological medical care. If a ruptured globe is suspected or possible, it is presumed ruptured unless ruled out by an emergency surgeon. The cases that are more analogous are the ones we cited, which are unfortunately district court cases. Two from Kansas. Palmer from 2017. Counsel, before you go on with your clarification on the order, is there any evidence on summary judgment, the summary judgment record that supports, let's assume we reread the pretrial order more broadly the way that you suggest. Did your expert opine on the possibility as being the emergent medical condition? Is there any evidence in the summary judgment record that would support that understanding? That would support what understanding, Your Honor? I'm sorry. That we're talking about the possibility of a ruptured globe as a emergent medical condition. Sure. Dr. Kirkpatrick, who was the radiologist who actually did the, who looked at the CT scan results, he said that there was a possibility of a ruptured globe. And Dr. Kuhlman, and this is, again, they minimized this. So I want to point the court to volume 13, page 21 of the appendix. This is Dr. Kuhlman's own testimony where he says that because they didn't know what this was, he actually didn't know and couldn't know whether my client was stable. And I think really that's what this comes down to is the failure to stabilize, the failure to ensure that he was stable before releasing him. Sure. If it was just a possibility, you have to stabilize for all those possibilities before you can release? No, Your Honor. You have to, the hospital has to be sure that he is in a stable condition. He is capable of self-care from what the record shows. That's the standard under EMTALA. Well, I think your answer then would be yes. If there is a possibility of four things, you have to stabilize for all four. You're saying stabilizing, possibility has to be stabilized for everything. I'm saying that the physician has to be sure that he's capable of self-care based on the record in front of him. And based on this record, under the summary judgment standard, that was sufficient for the physicians to have to at least do this for a ruptured globe. That's the DiCiccio case from the Eastern District of Pennsylvania in 2017, where it was a similar issue where a plaintiff had a possibility of angina. They didn't realize that. They didn't check for it, but they released him anyway. And the district court denied summary judgment. I don't believe there was an appeal. I see I'm long out of time. We'd ask the court to reverse and remand this case for trial on both the EMTALA claim and the dismissed Pendant State claims as a result. Thank you, Counsel. My notes indicate that Ms. Lynch might have wanted some time. No, Your Honor. Mr. Wright covered everything for us. Okay. Thank you, Counsel. Counsel excused and the case is submitted. Thank you, Your Honor.